# Mahaffey *v.* Mahaffey.

(Division B.   Oct. 26, 1936.   Suggestion of Error Overruled Dec. 7, 1936.)

[170 So. 289.   No. 32355.]

Lee M. Russell, of Jackson, for appellant.

Argued orally by **Lee M. Russell,** for appellant.

**Griffith, J.,** delivered the opinion of the court.

Appellant and appellee were formerly husband and wife. They separated on or about September 17, 1932. There is an only child, Ila May, then about ten years old. At the separation the child was left with her father; and the record indicates that appellant, the mother, although living less than thirty miles away, has seen little of the child since the separation. On April 2, 1934, the appellant, the wife, filed a bill for divorce and for the custody of the child. The bill charged the husband with habitual drunkenness, and habitual cruel and inhuman treatment. On the hearing the bill was sustained by the proof, and a decree of divorce was granted to the wife on November 16, 1934.

The decree also awarded the custody of the child to the mother during all of the months of the public school terms at the mother's residence; but provided further that the father should have custody during the summer vacations, and that the father should be bound to deliver the child to the mother at the beginning of each school term, and to make the first delivery immediately after the Christmas, 1934, holidays. The father did not obey the decree; and on February 6, 1935, the mother filed a petition styled a petition in habeas corpus, but which was in substance a petition for the enforcement of

the decree of November 16, 1934, and was treated as such by the chancellor. Answer was filed to this petition, and a hearing was had at the February, 1935, term of the court. The chancellor reaffirmed the former decree with the modification, however, that the child should be permitted to visit the father at each week end during the time she was to remain with her mother, and the father was "enjoined to come for her and take her back to her mother in time for school at the beginning of each week."

The excuse given by the father for not taking the child to the mother immediately after the holidays in 1934 was that the child bitterly resisted his efforts to so do, the child declaring that she would die before she would go, and that the mental anguish to take her by force over her heart-breaking protests was too great for him to withstand. At the hearing, in February, 1935, however, the child was delivered to the mother in court, and was then taken by the mother to her home on that afternoon. The next morning about ten o'clock the mother took the child to the home of the child's grandmother, the mother of the child's father, which home is in the city of the mother's residence, in order to get the child's clothes which had been sent forward. Immediately when within the home of her grandmother, the child, then about thirteen years old, announced and declared that she did not intend to return to her mother's residence; and upon the attempt of her mother to change her attitude, she upbraided her mother with the reproach that, "You went off and left me when I was little and now I am big enough to help myself." Some confusion seems to have resulted in this scene, during which the child escaped and could not be found. In the early afternoon of the same day the child appeared at her father's house, the record indicating that she had hitchhiked the distance of about thirty miles. The child wrote her mother a letter, or post card, upon her return, which letter was introduced in evidence, but was

not copied in the transcript. It may have been that the contents of this letter were to a considerable degree influential with the chancellor in making his last decree in this case.

The father did not return the child, but allowed her to remain, with the result that another proceeding by way of petition for the enforcement of the former decree and for contempt was instituted by the mother, and on the hearing thereof at the May, 1935, term of the court, the father gave substantially the same excuse for not returning the child which was theretofore given, namely, that the child strenuously fought his efforts to return her, and that he could not command the will to forcibly overcome her protests. A fair conclusion from his testimony is that he had decided to endure punishment for contempt rather than the displeasure of the child and the danger that she would despise him unless he yielded to her wishes in this matter. After a hearing on this second petition for the enforcement of the decree, the father, the mother, and the child being present in court, the chancellor entered his decree adjudging the child to be incorrigible and committing her to the state industrial and training school, until the further orders of the court, declaring in the decree that, from the evidence in the several hearings before him, the parents and both of them were unable to control and discipline the child or to make her comply with the orders of the court. From this decree the mother has appealed.

The chief argument advanced for a reversal is under two heads: First, that the petition under which the chancellor acted was one in habeas corpus, and that the chancellor could not make, in habeas corpus, any such decree, appellant relying upon Gray v. Gray, 121 Miss. 541, 83 So. 726, and others of like import. We have already mentioned that these petitions, while entitled petitions in habeas corpus, were, in fact and in substance, petitions for the enforcement of former de-.

crees of the court. The technical name given a pleading is immaterial. Moore v. Summerville, 80 Miss. 323, 332, 31 So. 793, 32 So. 294. It is the actual character of the pleading which is determinative of the decree allowable under it. Ventress v. Wallace, 111 Miss. 357, 362, 71 So. 636, L. R. A. 1917A, 921. And it has long been the practice, as was recognized in Ramsay v. Ramsay, 125 Miss. 185, 87 So. 491, 14 A. L. R. 712, that, in alimony and custody cases, a petition for the enforcement of a decree, and for contempt for the failure to comply therewith, is a sufficient basis to invoke the power of the court conferred by section 1421, Code 1930, which provides that as to such decrees, ''the court may afterwards, on petition, change the decree, and make from time to time such new decrees as the case may require.''

The second ground taken by appellant is that neither the petition nor the answer thereto makes any request or suggestion that the child be committed to the industrial and training school, and that the action of the court in so ordering was wholly outside the pleadings in the case, or of any request of any of the parties as a part of the pleadings. The authorities generally recognize the power, and in proper cases the duty, of the court to award the custody of a child to a third person. Keeler, Mar. & Div. (2 Ed.) 410; 19 C. J., 344. Such a power is implied in the broad language of section 1863, Code 1930. But it would be in practical effect to deny that power, or rather would be to place it in the hands of the father and mother to render it inoperative, if it were necessary to its exercise that one or the other of them should by petition or cross-petition so request. We will suppose a contest for the custody of their child between a father who is a drunken vagrant and a mother who is a common woman of the street, and neither of them, in their pleadings, make any suggestion that the custody be awarded to a third person. It would be unbearable that the court should be thereby prevented from the performance of a manifest duty to the child in commit-

ting it to some fit and suitable third person. This extreme illustration discloses ample reason for the rule that when the situation is such that it becomes the duty of the court upon a hearing with all parties present that the child be placed in the custody of a third person, the court may do so, although the decree in that respect does not conform to the prayer either of the petition or the cross-petition. Upon the particular point we approve and adopt the language of the court in Morrill v. Morrill, 83 Conn. 479, at page 489, 77 A. 1.

The general practice is, however, that an award of custody to a third person is made either (1) upon the formal intervention of the said third person, or (2) upon the personal appearance of the third person, who will and does, in open court, accept the award and solemnly agree to perform the duties of custodian, fully and faithfully. But if such an intervention or personal appearance be necessary to the validity of the order, which we do not now decide, such a step is not necessary when the child is committed to the state industrial and training school. The state as parens patriae of all children has supplied the industrial and training school as an instrumentality in the better fulfillment of its duties as such, and to certain classes of children in need of the good offices of such institution, of whom incorrigibles have been named by the statute (Code 1930, sec. 7250) as one of the classes. Under the Constitution and laws of the state, the chancellor is constituted the guardian in chief of all children within his jurisdiction, with the duty to take care as to their interest in all controversies wherein their interests are involved. And by the statute, the said institution as an instrumentality for discipline, control, reform, and training has been put at the command of the chancellor in cases of the classes of children above mentioned. In point of law, therefore, the said institution is, in contests between others for the custody of the child, an intervener in all cases of need therefor, and its obligation to perform faithfully and

well the duties as custodian is prescribed by law, and no assurance thereof in open court is necessary.

Having thus concluded that the chancellor was empowered to make the order here in question, the final inquiry is whether he acted correctly in the given situation; and this inquiry resolves itself into the two questions whether the child is or was an incorrigible, and whether she should have been so adjudged without first giving the mother a further chance to control the child. It is the strong policy of the law that children shall remain in the custody of their parents, or one of them, unless they are both clearly unfit; but unfitness may be found in such a want of willingness or ability to control and discipline the child as that the child or children are obviously in serious danger of becoming immoral or otherwise delinquent to the extent of being, in the future, unacceptable members of the adult citizenship of the state. And, in the matter of control and discipline, the character both of the child or children and of the parents becomes a material issue. The same parent might be able to control one child, and be helpless in so doing as to another; or the same child might be beyond control by one person and capable of management by another. Therefore, under statutes providing for commitment to a state disciplinary school, the proper definition of an "incorrigible child" is one who is incapable of being managed or corrected or disciplined in his present situation and under his present control. In re Hook, 95 Vt. 497, 115 A. 730, 733, 19 A. L. R. 610.

The situation which confronted the chancellor here was a confessed inability or unwillingness on the part of the father to control the child so as that the orders of the court would be obeyed. To put the father in jail for contempt would have been to put the child at large. The only other recourse was to allow the child contumaciously to set at naught the orders of the court and remain with her father of her own will and decision, conscious of her unlawful conduct every day of her life,

or send the sheriff to deliver the child thirty miles away and to keep the sheriff on the ground to return her as often as she came back. Or else the mother would have to keep some person on watch to prevent the escape of the child, which could not be done if the child was to attend school. And what probable prospect was there offered that, if physically restrained and watched for a reasonable period, the child would become reconciled to the situation and would thence remain with the mother without further trouble?

We must keep in mind that this child had, at the time of the last decree, arrived at or about the age of thirteen; she had reached the age where the conviction which had been formed in her mind had become firm that her mother had abandoned her when she was small and needed her mother; and that it was only when she (the child) had become large enough to be of service that the mother became interested in her custody. As already observed, she had become so stubborn in that conviction that she openly and angrily proclaimed it in the presence of her mother and her father's kindred. Was there any chance that the hostility resulting from such a conviction in a child of that age could be overcome when the child would all the while be in the reach of and within easy communication with the father and of so many of his relatives? It might have been possible, but the probabilities were, to say the least, not favorable. The chancellor had the child and all the parties before him; he could see their demeanor and estimate their dispositions and feelings. We have no such advantage here, and we are unwilling to interfere with what he has done. If, when freed for the time being from all the former distracting and unfavorable surroundings, the child has been taught obedience to authority and amenability to discipline, and has learned the necessity towards a worthy womanhood of yielding obedience, the mother still desires her custody, the

chancellor has by his decree left the way open for a new application, and we believe it would be best to allow the matter to remain in that attitude at this time.

Affirmed.